# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

AUSTIN BROOKS, *et al*.,                                    Case No. 1:14-cv-412
      Plaintiffs,                                    Litkovitz, M.J.

      vs.

SUSIE JANE SKINNER, *et al.*,                        **ORDER**
      Defendants.


      Plaintiffs Austin Brooks ("Austin"), Vincent Brooks, on behalf of minor child A.B., and

Randy Brooks, on behalf of minor child N.B., bring this racial discrimination action against

defendants Ripley, Union, Lewis, Huntington School District and School Board ("RULH"),

Martha Hasselbusch, and Susie Skinner under 42 U.S.C. § 1983 and Title VI of the Civil Rights

Act of 1964 ("Title VI"), 42 U.S.C. § 2000d.  This matter is before the Court on defendants'

motion for summary judgment (Doc. 49), plaintiffs' response in opposition (Doc. 54), and

defendants' reply memorandum (Doc. 59).

## I. Background

      Plaintiffs Austin and N.B. are biracial students who attended RULH schools.  Plaintiff

A.B. is a biracial student who still attends RULH High School.  Defendant Hasselbusch was the

principal of RULH Middle School during the 2011-12 school year.  Defendant Skinner has been

the principal of RULH High School since 2010.

      Plaintiffs' complaint alleges that since the beginning of the 2011-12 school year they

have experienced "frequent harassment on the basis of their race," which created a hostile

educational environment.  (Doc. 1 at ¶¶ 14-16, 38, 50, 56).  Plaintiffs allege that the harassment

occurred "on a daily basis."  (*Id.* at ¶ 42).  Plaintiffs allege that defendants were deliberately

indifferent to the incidents of racial harassment and denied plaintiffs access to educational

opportunities guaranteed under Title VI and equal protection on the basis of their race under the Fourteenth Amendment. (*Id.* at ¶¶ 41-47, 50-56).

## II. Facts

### A. RULH

RULH is a school district of approximately 960 students, a "small percentage" of whom are minority students. (Deposition of Linda Naylor, Doc. 45 at 10). RULH contains three schools, and the principals of those schools report to the school superintendent. (*Id.* at 20). Dr. Linda Naylor has been the superintendent of RULH since August 2013. (*Id.* at 8). Susie Skinner has been the principle of RULH High School since 2010. (Deposition of Susie Skinner, Doc. 48 at 5-6). Martha Hasselbusch was the principal of RULH Middle School during the 2011-12 school year. (Deposition of Martha Hasselbusch, Doc. 47 at 15). Betty Miller has been a bus driver for RULH since 1987 or 1988. (Deposition of Betty Miller, Doc. 46 at 6, 8). Miller testified that she would write up discipline referrals and give them to her supervisor or school officials, but she would not personally discipline students for disciplinary issues on the bus. (*Id.* at 13-14).

### B. Austin[1]

Austin attended RULH school district until his graduation from high school in 2013. (Affidavit of Austin Brooks, Doc. 54-1, Exh. A at ¶ 1). He was 19 at the time of his deposition on May 28, 2015. (Deposition of Austin Brooks, Doc. 30 at 1, 6). In March 2012, Skinner told Austin that he "looked like a skunk with that hair." (*Id.* at 13). Austin testified that Skinner frequently told him that he "looked like a skunk with that hair" because he had dyed a blonde stripe down the middle of his hair. (*Id.*). Austin frequently told Skinner not to make such

---

[1] The parties' briefs address the facts and claims of each plaintiff separately. For clarity's sake, the Court adopts this format.

statements. (*Id.* at 14). While he was not aware that "skunk" was a racial slur, he felt that Skinner's comment was racially motivated because "[i]t was always [him] that she picked on. She never said anything to anybody else." (*Id.* at 14-15). Austin testified that Skinner would often ask, "Why are you bringing up the race card?" in circumstances where Austin had not said anything about race. (*Id.* at 16). Skinner admitted making the race-card comment to Austin. (Doc. 48 at 65).

Austin further testified that in the 2007-08 school year, when he was in the seventh grade, D.A. called him a "nigger." (Doc. 30 at 17-18). In response, Austin called D.A. a "honky." (*Id.* at 17). Austin indicated that after he reported the incident he received an in-school suspension, but D.A. was not disciplined. (*Id.* at 17-18; Doc. 54-1, Exh. A at ¶ 4). He testified that he did not report additional incidents of racism to school authorities because "[n]othing happened" when he did report. (Doc. 30 at 21). He told Ms. Puckett, his Freshman English teacher, that "people were making racial slurs," but "nobody would get in trouble." (*Id.* at 21-22).

Austin states that in 2008, when he was in the eighth grade, a white student pulled down Austin's pants. (Doc. 54-1, Exh. A at ¶ 3). Austin called the white student a "fag," and the white student "swung at [him]." Austin hit the white student, was suspended for three days, and was kicked off the basketball team. D.A., a white student, was suspended that year as well, but was not kicked off the basketball team. (*Id.*).

Austin further states that in 2009 Ms. Puckett said "nigger" in class. (*Id.* at ¶ 5). During the 2010-11 school year, another teacher named Mr. Stanfield referred to Austin as "8-ball" on many different occasions. (*Id.* at ¶ 6). Austin does not indicate that he reported these incidents. (*See generally* Doc. 54-1, Exh. A). Finally, Austin attests that during his senior year, his

basketball coach kicked him off the team for having a bad attitude, but Austin does not indicate that this was related to race. (*Id.* at ¶ 7).

    C. <u>A.B.</u>

    A.B. is Austin's younger sister. (Deposition of A.B. (part 1), Doc. 28 at 15). She was 16 at the time of her deposition on May 28, 2015. (*Id.* at 1, 7). A.B. attests that on August 29, 2011, she reported to Betty Miller, her bus driver, that A.T. said the "N-word" on the bus. (Affidavit of A.B., Doc. 54-5, Exh. E at ¶ 3). The next day, Miller made A.B. and N.B. sit at the front of the bus. This made A.B. angry because "the student saying the racist words wasn't made to sit in the front, but [she] was for reporting him." (*Id.*). Defendant Hasselbusch indicated that on August 29, 2011, she received a letter from Randy Brooks, N.B.'s father, stating that A.T. was "bothering" N.B. on the bus. (Defendants' Responses to Plaintiffs' Interrogatories, Doc. 49-1, Exh. C). After receiving the letter, Hasselbusch met with N.B. and A.T., and N.B. told her that A.T. had called him a "bad name" on the bus, which A.T. denied. A.T.'s mother told Hasselbusch that N.B. was "bothering" A.T. and had threatened to "beat up" A.T. Hasselbusch warned both N.B. and A.T. to leave each other alone, contacted their parents, referred the students to the school counselor, and directed the bus drivers to keep a closer eye on them. (*Id.*).

    On October 4, 2011, A.B. reported that L.J. said "peace out nigga" as she left the locker room for gym class. (Deposition of A.B. (part 2), Doc. 29 at 59-60; Defendants' Responses to Plaintiffs' Interrogatories, Doc. 54-9, Exh. I). In response to this incident, Hasselbusch met with L.J., gave her a verbal warning for inappropriate language, assigned her detentions, and contacted her mother. (Doc. 54-9, Exh. I). A.B. also received an apology letter from L.J. (Doc. 29 at 59; Doc. 54-9, Exh. I).

In October 2011, A.T. used the "N word" on the bus.  (Discipline Referral of A.T. dated Oct. 7, 2011, Doc. 49-1, Exh. G).  In response, Hasselbusch held a conference with all the students involved and their parents.  She also indicated that "N.B. and his brother <u>must</u> have an assigned seat at front of bus.  (This was a directive from the 8/29/11 incident.)"  Finally, she directed the bus driver to issue a disciplinary referral if N.B. refused to stay in his assigned seat. (*Id.*).  A.B. testified that during this incident A.T. made racial insults to both her and N.B.  (Doc. 28 at 33).  Defendant Hasselbusch indicated that on October 6, 2011, A.B. reported she overheard A.T. say "nigger" on the bus.  (Doc. 49-1, Exh. C).  Hasselbusch met with A.T., contacted his mother, gave him a verbal warning for inappropriate language, assigned him detentions, referred him to the school counselor, and set up a mentorship for him with a local police officer.  Hasselbusch further indicated that A.T. also wrote an apology letter to A.B.  (*Id.*).

On November 28, 2011, A.B. received a one-day suspension for "[a]ssault/[m]enacing/[i]ntimidation."  (Letter to Mr. Vincent Brooks and Notice of Intended Suspension, both dated Nov. 28, 2011, Doc. 54-6, Exh. G).  A.B. testified that L.J. was bullying S.B., A.B.'s eight-year-old cousin.  (Doc. 28 at 37; Doc. 29 at 101).  John Brooks, who was S.B.'s father and A.B.'s uncle, approached A.B. and said he would pay A.B. to beat up L.J. if the bullying continued.[2]  (Doc. 28 at 37-38).  A.B. testified that her uncle was not serious, but A.B. told C.B. that she would beat up L.J. once she got off her crutches.  (*Id.* at 38-39).  Hasselbusch indicated that A.B. admitted that John Brooks had given her money to beat up L.J.  (Doc. 54-9, Exh. I).  Hasselbusch called the police.  (Ohio Uniform Incident Report dated Nov. 28, 2011, Doc. 54-8, Exh. H).  A.B. testified that she was charged as an unruly child as a result of this incident.  (Doc. 28 at 40).  She further testified that the charges were dismissed at the initial hearing when the judge told her "they didn't see a reason for [her] to be there."  (*Id.* at 44-45).  A

---

[2] John Brooks was employed as a custodian at RULH school district when this occurred.  (Doc. 54-9, Exh. I).

journal entry from the juvenile case indicates that the juvenile court granted the prosecution's motion to dismiss the case against A.B. on December 27, 2011.  (Journal Entry in Case No. DL20112290, Doc. 54-10, Exh. J).

On January 10, 2012, Hasselbusch again called the police and reported that she had heard from two students that A.B. had threatened to beat up L.J.  (Ohio Uniform Incident Report dated Jan. 10, 2012, Doc. 54-8, Exh. H).  A.B. received a three-day suspension related to this incident.  (Letter to Mr. Vincent Brooks dated Jan. 11, 2012, Notice of Intended Suspension dated Jan. 10, 2012, and Discipline Referral dated Jan. 11, 2012, Doc. 54-6, Exh. G).  A.B. testified that while she was waiting outside Hasselbusch's office to see her concerning this incident, she overheard Hasselbusch say "nigger" two times while on a phone call.  (Doc. 28 at 47).  A.B. believed that Hasselbusch may have been on the phone with a parent and repeating to that parent what a student had said.  (*Id.* at 48-49).  Nevertheless, A.B. believed that Hasselbusch was using the word in a negative way and could have said "the N word" instead.  (*Id.* at 48-50).

On December 20, 2013, A.B. completed a statement that R.H. had said the "N word" the day before.  (Untitled Statement of A.B. dated Dec. 20, 2013, Doc. 54-15, Exh. P).  A.B. testified that she was not present when R.H. made the comment and that it was not directed at her.  (Doc. 29 at 63-64).  Defendant Skinner was out on medical leave when this occurred.  (Doc. 48 at 36-37).  Skinner's investigation notes dated January 9, 2014 revealed that on December 19, 2013, R.H. said he wanted to join the Ku Klux Klan because students listening to rap music were acting like "niggers."  (*Id.* at 39-40; Notes Concerning Dec. 19, 2013 Incident, Doc. 54-15, Exh. P).  R.H. received a three-day suspension for using a racial slur.  (Doc. 54-15, Exh. P).

On February 20, 2014, A.B. reported to her teacher, Ms. Rau, that she had found the words "Zach is a nigger" written in a drawer of a computer desk.  (Doc. 29 at 66-67).  Ms. Rau

responded by wiping the words off the desk and saying, "Sorry. People are stupid." (*Id.* at 68). A.B. did not report the incident to anyone else, and defendant Skinner testified that Ms. Rau never informed her of the situation. (*Id.*; Doc. 48 at 45-46). However, Dr. Naylor testified that Ms. Rau reported the incident to Skinner, and Skinner informed Naylor of it. (Doc. 45 at 28-29).

A.B. testified that in May 2014, A.C., a white student, was telling A.B. a story about A.C.'s boyfriend, an African American, who had tried to break into a house. (Doc. 29 at 70-72). A.C. ended the story by saying, "Fucking niggers." (*Id.* at 72). A.B. did not recall reporting the incident. (*Id.* at 73).

A.B. further testified that in May 2014, she overheard E.C. say "Damn, Nigga" to a friend on the bus. (*Id.* at 74). A.B. reported the incident to Miller. (*Id.* at 75). A.B. testified that Miller did not say anything and "just kind of looked at [her]." (*Id.* at 75-76). The record does not contain any evidence that Skinner or RULH knew about or responded to this incident.

A.B. testified that on May 14, 2014, T.H. told C.M. that she did not like black people and was afraid that A.B. would be angry with her for saying that. (*Id.* at 76-78). T.H. said this in response to C.M. asking her if she liked black mushrooms. (*Id.* at 76). A.B. was not present during the conversation between C.M. and T.H., but C.M. told her about it. (*Id.* at 77-78). A.B. missed class because Skinner called her to the office to discuss the situation. (*Id.* at 77; Doc. 54-5, Exh. E at ¶ 7). Skinner testified that T.H., a low functioning student with disabilities, came to her office and was very fearful of being beaten up for saying that she did not like black people. (Doc. 48 at 50-51). Skinner further testified that she called A.B. to her office but sent her back to class within seconds because T.H. realized that A.B. was not the student who had confronted her about her statement. (*Id.*).

7

A.B. testified that on May 27, 2014, M.H. said "Fuck you, Nigger" to a group of his white friends.  (Doc. 29 at 87-88; *see also* Discipline Referral of M.H. dated May 27, 2014, Doc. 41 (sealed) at 28).  A.B. reported the incident to her teacher, and M.H. was suspended for three days.  (Doc. 29 at 88-89; Letter to M.H.'s Parents, Notice of Intended Suspension of M.H., and Discipline Referral of M.H., all dated May 27, 2014, Doc. 41 (sealed) at 25-27).

A.B. attests that on October 23, 2014, she was mixing brown paint in art class when a white student said to her, "[L]et me paint you, oh wait, it won't show up."  (Doc. 54-5, Exh. E at ¶ 5).  The student later said to A.B. while she was putting on hand cream, "[W]hy do you always have on lotion, cause you're so ashy?"  (*Id*.).  The record does not reveal that A.B. reported this incident.

A.B. testified that on November 5, 2014, A.S. and B.C. said that they did not like black people while in A.B.'s presence.  (Doc. 28 at 12; Doc. 29 at 85).  A.B. reported the incident, called her uncle, and went home early from school because she was very upset.  (Doc. 28 at 12; Doc. 54-5, Exh. E at ¶ 8).  A.S. and B.C. were each suspended for four days.  (Letter to B.C.'s Parents, Notice of Intended Suspension of B.C., Letter to A.S.'s Mother, and Notice of Intended Suspension of A.S., all dated Nov. 5, 2014, Doc. 41 (sealed) at 11-14; Doc. 48 at 52-53).

A.B. testified that during the 2014-15 school year, R.P. sent her a picture of another student and referred to that student as a "niggtard."  (Doc. 29 at 104).  A.B. did not report the incident to anyone.  (*Id.* at 105).

D.  N.B.

N.B. is the cousin of Austin and A.B.  (Doc. 28 at 15-16).  He was 16 at the time of his deposition on May 28, 2015.  (Deposition of N.B., Doc. 31 at 1, 7).  Disciplinary records reveal that on March 22, 2011, K.L. received a three-day out-of-school suspension for calling N.B. the

8

"N word" while they were waiting for the bus. (Discipline Referral of K.L. dated Mar. 22, 2011, Doc. 49-1, Exh. B).

N.B. testified that A.M. called him a "nigger" during social studies class, but N.B. could not recall when this occurred. (Doc. 31 at 29-30). N.B. tried to hit the student but missed, for which N.B. received a three-day in-school suspension. (*Id.*). N.B. told Hasselbusch what A.M. had said, but he did not know if A.M. was punished for his involvement in this incident. (*Id.* at 32-33).

On another occasion that occurred after this incident, A.M. said "nigger" in art class to A.A. (*Id.* at 52). N.B. asked A.M., "What did you say?" (*Id.* at 52-53). A.M. responded, "Freedom of speech." (*Id.* at 53). N.B. pushed A.M. into a filing cabinet and received an in-school suspension. (*Id.*). Disciplinary records reveal that on January 24, 2012, A.M. received a two-day out-of-school suspension, and N.B. received a one-day out-of-school suspension for an incident of harassment/bullying that occurred during art class. (Letter to A.M.'s Mother dated Jan. 24, 2012, Notice of Intended Suspension of A.M. dated Jan. 23, 2012, Discipline Referral of A.M. dated Jan. 23, 2012, Discipline Referral of N.B. dated Jan. 24, 2012, and Notice of Intended Suspension of N.B. dated Jan. 24, 2012, Doc. 49-1, Exh. A).

N.B. testified that on February 18, 2012, he saw T.B. and K.B. wearing homemade beaded bracelets that spelled the word "nigger" on them. (Doc. 31 at 35-36). N.B. reported them to the principal. (*Id.* at 37). A.B. told N.B. that Hasselbusch had summoned the students to her office. (*Id.* at 36). N.B. saw them wearing the same bracelets on their ankles later that day. (*Id.* at 36-37). N.B. believed that Hasselbusch allowed this behavior to continue by not confiscating the bracelets. (*Id.* at 37-38).

N.B. testified that in October 2012, J.C. called him a "nigger" on the bus, after which N.B. "smacked him in his face." (*Id.* at 57-58, 60). Disciplinary records reveal that N.B. and J.C. each received a one-day in-school suspension for this incident. (Notice of In-School Suspension of N.B. dated Oct. 12, 2012, Discipline Referral of N.B. dated Oct. 15, 2012, Discipline Referral of N.B. dated Oct. 12, 2012, Statement of N.B. dated Oct. 11, 2012, Discipline Referral of J.C. dated Oct. 9, 2012, and Undated Statement of Susie Skinner Concerning Bus 8 Incident, Doc. 41 (sealed) at 50-55).

N.B. testified that in addition to the August and October 2011 incidents involving A.T. described above in the A.B. section, A.T. once said that "black people shouldn't belong in this world." (Doc. 31 at 50). N.B. and A.T. were sent to the office concerning this incident. (*Id.*).

N.B. testified that after the 2012-13 school year, his family moved from the RULH school district because his dad wanted him to go to a different school. (*Id.* at 11, 15). To facilitate his attendance in a different school district, N.B. lived apart from his family and moved in with court-appointed "therapy guardians."[3] (*Id.* at 9-10).

## III. Summary Judgment Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Under Federal Rule

---

[3] The Court notes that in their opposition to the instant motion, plaintiffs have also referred to incidents where C.B. called N.B. a "nigger," and T.B. called N.B. a "nigger" and said that he did not "speak black people." (Doc. 54 at 12). In support, plaintiffs have offered a number of handwritten statements purportedly made by various students. (*See* Statement of J.S. dated Nov. 11, 2010, Statement of B.T. dated Nov. 9, 2010, Statement of A.B. dated Nov. 9, 2010, Statement of N.B. dated Nov. 9, 2010, Statement of B.D. dated Nov. 11, 2010, Statement of M.J. dated Nov. 11, 2010, and Statement of M.U. dated Nov. 11, 2010, Doc. 57-1, Exh. M). These statements are hearsay, and plaintiffs have not identified any exception to the rule against hearsay that would make these statements admissible. Thus, the Court may not consider them when deciding defendants' motion for summary judgment. *See, e.g., Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) ("[E]vidence submitted in opposition to a motion for summary judgment must be admissible. Hearsay evidence . . . must be disregarded.")

of Civil Procedure 56(c), a grant of summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Satterfield,* 295 F.3d at 615; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enters., Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a *prima facie* case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

## IV. Resolution

Defendants move for summary judgment on plaintiffs' Title VI and § 1983 claims. Defendants argue that many of the instances of discrimination alleged by plaintiffs fall outside of the two-year statute of limitations for claims arising under Title VI and § 1983, and plaintiffs should not be permitted to seek damages for events occurring prior to May 2012. (Doc. 49-1 at 15-16). Defendants assert they are entitled to summary judgment on plaintiffs' Title VI claim

11

because the discrete incidents of harassment alleged are not so severe or pervasive that it can be said plaintiffs were deprived of access to educational opportunities or benefits. (*Id*. at 11-15). Defendants further assert that granting summary judgment in their favor on plaintiffs' Title VI claim is appropriate because the undisputed evidence establishes they were not deliberately indifferent to the incidents of harassment reported by plaintiffs. (*Id.* at 16). Rather, defendants contend their responses to the reports, i.e., investigating the incidents and disciplining the offending students, were reasonable and effective measures. (*Id*. at 16-18). With respect to plaintiffs' § 1983 claim, defendants argue they are entitled to summary judgment because the undisputed evidence and plaintiffs' own testimony demonstrates that defendants were not deliberately indifferent to plaintiffs' reports of harassment nor were their responses clearly unreasonable. (*Id*. at 19-20).

Plaintiffs respond that the evidence of racially discriminatory incidents is sufficient to establish that plaintiffs suffered harassment that was severe, pervasive, and objectively offensive. (Doc. 54 at 4-13).[4] Plaintiffs argue that this continuing harassment deprived them of the opportunity to learn in an educational environment free of racism and harassment. (*Id.* at 13-14). Additionally, plaintiffs contend that the discrimination caused A.B. to miss class and N.B. to transfer to another school district. (*Id.* at 14-15). Plaintiffs assert that defendants were deliberately indifferent to the harassment because they failed to adhere to any clear policies in addressing racial harassment and failed to utilize outside resources to address the ongoing racial problems. (*Id.* at 16-18). Plaintiffs assert that defendants' failure to take further remedial action after disciplining individual students proved inadequate and ineffective is further evidence of defendants' deliberate indifference. (*Id.* at 18-19).

---

[4] Page references to Doc. 54 refer to the page numbers provided by CM/ECF, not the internal page numbering of the document.

In reply, defendants continue to challenge much of the evidence on which plaintiffs rely as barred by the statute of limitations. (Doc. 59 at 2). Defendants assert that plaintiffs never reported some of the incidents of harassment to school officials. (*Id.* at 2-3, 8-9). Defendants argue that their responses to reported incidents of harassment were reasonable. (*See id.* at 9-12). Defendants argue that the harassment that plaintiffs experienced was not severe and pervasive because it never went beyond teasing and name calling. (*Id.* at 14). Defendants contend that they were not deliberately indifferent because they addressed every incident of harassment that plaintiffs reported to them. (*Id.* at 15).

A. STATUTE OF LIMITATIONS

Title VI, similar to § 1983, does not contain its own statute of limitations but borrows the state's personal injury limitations period. *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 729 (6th Cir. 1996) (finding that the state personal injury limitations period applies to Title VI). The Sixth Circuit has held that claims brought pursuant to Title VI and § 1983 are governed by the two-year statute of limitations found in Ohio Rev. Code § 2305.10. *Tolbert v. State of Ohio Dep't of Transp.*, 172 F.3d 934, 937, 939 (6th Cir. 1999) (holding that federal Title VI and § 1983 claims are subject to the two-year statute of limitations governing Ohio state law personal injury claims). However, in applying a forum state's statute of limitations to a federal statute, a federal court should also give effect to any applicable tolling provisions. *Doe v. Ann Arbor Pub. Sch.*, No. 08-cv-10129, 2008 WL 880538, at *2 (E.D. Mich. Mar. 31, 2008); *see West v. Conrail*, 481 U.S. 35, 39-40 & n.6 (1987). Under Ohio law, the statute of limitations is tolled if the person entitled to bring a cause of action is a minor. Ohio Rev. Code § 2305.16. Thus, for a minor, the statute of limitations begins to run once the minor reaches the age of majority. *Id.*

13

Here, plaintiffs filed their complaint in May 2014. (Doc. 1). At the time of their depositions in May 2015, Austin was 19, and A.B. and N.B. were 16. (Doc. 30 at 1, 6; Doc. 28 at 1, 7; Doc. 31 at 1, 7). Thus, at the time their complaint was filed, Austin was 18, and A.B. and N.B. were still minors. Because the statute of limitations is tolled for minors in Ohio, Austin would have until sometime in 2016 to file his claims, and A.B. and N.B. would have two years from reaching the age of majority to file their claims. Ohio Rev. Code §§ 2305.10, 2305.16; *Tolbert*, 172 F.3d at 939. Thus, the Court finds that plaintiffs' complaint is timely as to all incidents of harassment that occurred while plaintiffs were minor students at RULH school district.

B. <u>TITLE VI</u>

Title VI provides that "[n]o person in the United States shall, on the ground of race . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Public education entities such as RULH are subject to this mandate. *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012) (citing 34 C.F.R. § 100.13(i) (2000)) (defining "recipient" to include any public "agency, institution, or organization, or other entity . . . in any State, to whom Federal financial assistance is extended."). A "program or activity" under Title VI includes "a local educational agency . . . , system of vocational education, or other school system." 42 U.S.C. § 2000d-4a(2)(B). Deliberate indifference to student-on-student harassment is actionable under Title VI. *Maislin v. Tenn. State Univ.*, 665 F. Supp.2d 922, 930 (M.D. Tenn. 2009).

In a Title VI case, the proper defendant "is an entity rather than an individual." *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 95 F. Supp.2d 723, 741 (N.D. Ohio 2000). "It

is beyond question . . . that individuals are not liable under Title VI." *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1171 (11th Cir. 2003). *See also Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521 (3d Cir. 2011) ("Individual liability may not be asserted under Title VI."); *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1356 (6th Cir. 1996) (noting that plaintiff's Title VI claims failed because he asserted the claims against the individual officials involved in an incident that occurred at a school "and not against the school, the entity allegedly receiving financial assistance").

Courts have adapted the test laid out by the Supreme Court in *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999), in analyzing Title VI claims based on student-on-student harassment. *See, e.g., Zeno*, 702 F.3d at 665; *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cty.*, 334 F.3d 928, 934 (10th Cir. 2003); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 n.5 (3d Cir. 2001). To hold defendants liable for student-on-student racial harassment under Title VI, plaintiffs must establish: "(1) the harassment was so severe, pervasive, and objectively offensive that it could be said to deprive [plaintiffs] of access to the educational opportunities or benefits provided by the school; (2) [defendants] had actual knowledge of the harassment; and (3) [defendants were] deliberately indifferent to the harassment." *Maislin*, 665 F. Supp.2d at 931 (restating the *Davis* test). Defendants assert they are entitled to summary judgment because: (1) the incidents of harassment alleged were few and infrequent such that plaintiffs have not established the severity prong of their Title VI claim; and (2) the undisputed evidence demonstrates that defendants were not deliberately indifferent to plaintiffs' reports of harassment but reasonably responded to each instance by effectively disciplining the offending students.

In determining whether the alleged harassment was so severe, pervasive, and objectively offensive that it could be said to have deprived plaintiffs of access to educational opportunities,

courts look to the nature, frequency, and duration of the harassment, as well as its effect on the victim. *Marcum ex rel. C.V. v. Bd. of Educ. of Bloom-Carroll Local Sch. Dist.*, 727 F. Supp.2d 657, 669 (S.D. Ohio 2010) (applying the *Davis* test in the Title IX context).[5]  The Supreme Court has cautioned that lower courts should "bear in mind" that "children may regularly interact in a manner that would be unacceptable among adults" and that students "often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." *Davis*, 526 U.S. at 651.  "Damages are not available for simple acts of teasing and name-calling among school children . . . ." *Id.* at 652.  However, courts have recognized that the frequent use of racial slurs constitutes more than "simple acts of teasing and name-calling."

For example, the Second Circuit has held that "frequent pejorative references" to a person's skin color, including "nigger," "homey," and "gangster" constituted evidence from which "the jury reasonably could have found that the harassment . . . endured went beyond the non-actionable 'simple acts of teasing and name-calling among school children.'" *Zeno*, 702 F.3d at 667; *see also DiStiso v. Cook*, 691 F.3d 226, 242-43 (2d Cir. 2012) ("Defendants do not—and cannot—dispute that . . . use of the reviled epithet 'nigger,' raises a question of severe harassment going beyond simple teasing and name-calling.").  The Ninth Circuit has also held that frequently being called a "nigger" by white classmates could establish harassment that was severe and pervasive. *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033-34 (9th Cir. 1998) ("It does not take an educational psychologist to conclude that being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, being

---

[5]Courts employ the *Davis* test when resolving both Title VI and Title IX claims because the two statutes are parallel in the liabilities imposed on entities receiving public funds and differ only with respect to their prohibition on the type of harassment, i.e., race versus sex discrimination. *See Maislin*, 665 F. Supp.2d at 928-30 (discussing the similarities between Titles VI and IX and upholding the viability of Title VI deliberate indifference claims as set forth in *Davis*). *See also Harris v. Members of Bd. of Governors of Wayne State Univ.*, No. 10-11384, 2010 WL 5173666, at *3 (E.D. Mich. Nov. 19, 2010) (citing *Maislin*, 665 F. Supp.2d at 928-29) (noting that "[t]he analysis of the viability of claims brought under [Title VI and Title IX] is the same.").

16

shamed and humiliated on the basis of one's race, and having the school authorities ignore or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit from schooling as her white counterparts."). Having to endure frequent racial epithets such as these can deprive a student of the educational benefit of learning in "a supportive, scholastic environment free of racism and harassment." *Zeno*, 702 F.3d at 667.

The second element of the *Davis* test is actual notice, which the Supreme Court explained in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998). In *Gebser*, a high school student sued a school district under Title IX, alleging that a teacher sexually abused her. *Id.* at 277-79. The Supreme Court rejected the use of agency or negligence principles to render the school district liable for monetary damages under Title IX. *See id.* at 285 ("[W]e conclude that it would 'frustrate the purposes' of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment based on principles of *respondeat superior* or constructive notice, *i.e.*, without actual notice to a school district official."). Instead, the Court held that, for a school district to be liable for damages, an "appropriate person" must have had actual notice of the harassment and an opportunity to rectify any violation. *Id.* at 290. The Court explained that an "appropriate person" is an official "who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [school district's] behalf[.]" *Id.* In response to the dissent's argument that the offending teacher "had knowledge of his own actions," the Court explained that "[w]here a school district's liability rests on actual notice principles . . . the knowledge of the wrongdoer himself is not pertinent to the analysis." *Id.* at 291. In applying *Gebser*, appellate courts have required actual knowledge by the school board itself, the school superintendent, or a school principal. *See, e.g., Davis v. DeKalb Cty. Sch. Dist.*, 233 F.3d 1367, 1371 (11th Cir. 2000); *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 258

17

(6th Cir. 2000) (principal); *Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir. 2000) (principal).

The third element of the *Davis* test, deliberate indifference, "can be found in cases where officials of a recipient entity with authority to take corrective action, having been advised of a Title [VI] violation, decide not to remedy the violation." *McCoy v. Bd. of Educ., Columbus City Sch.*, 515 F. App'x 387, 391 (6th Cir. 2013) (citing *Gebser*, 524 U.S. at 290-91). "[A] plaintiff may demonstrate [a] defendant's deliberate indifference to discrimination 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Vance*, 231 F.3d at 260 (quoting *Davis*, 526 U.S. at 642).

> The recipient is not required to "remedy" [the] harassment nor ensure that students conform their conduct to certain rules, but rather, "the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." The deliberate indifference standard "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." The standard does not mean that recipients must expel every student accused of misconduct. Victims do not have a right to particular remedial demands. Furthermore, courts should not second guess the disciplinary decisions that school administrators make.

*Id.* (quoting *Davis*, 526 U.S. at 648-49). However,

> [W]here a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances.

*Id.* at 261. The Sixth Circuit has further explained,

> [E]ven though a school district takes some action in response to known harassment, if further harassment continues, a jury is not precluded by law from finding that the school district's response is clearly unreasonable. We cannot say that, as a matter of law, a school district is shielded from liability if that school district knows that its methods of response to harassment, though effective against an individual harasser, are ineffective against persistent harassment against a

single student. Such a situation raises a genuine issue of material fact for a jury to decide.

*Patterson v. Hudson Area Sch.*, 551 F.3d 438, 448 (6th Cir. 2009).

Here, as an initial matter, defendants frame their motion for summary judgment around the questions of whether discrete incidents of harassment against plaintiffs were severe and pervasive, and whether defendants' response to each reported incident, standing alone, was reasonable. However, the Court finds that this framing of plaintiffs' claims is contrary to law. Specifically, in analyzing a hostile environment claim, "courts have adopted a 'totality of the circumstances' approach that rejects disaggregation of the allegations and requires only that the alleged incidents cumulatively have resulted in the creation of a hostile environment." *Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F.Supp.2d 304, 319 (S.D.N.Y. 2000). The Sixth Circuit has held that "the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) (emphasis in original) (analyzing a hostile environment claim under Title VII).[6] Thus, in considering whether summary judgment is appropriate, and with these principles in mind, the Court will not disaggregate the incidents of harassment plaintiffs experienced at RULH schools.

As an additional preliminary matter, the Court notes that the parties have produced and discussed post-complaint evidence of harassment in arguing whether summary judgment is appropriate. "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). A

---

[6] Courts often turn to the "substantial body of case law developed under Title VII" for assistance in interpreting discrimination claims in the educational context. *See, e.g.*, *Arceneaux v. Vanderbilt Univ.*, 25 F. App'x 345, 347 (6th Cir. 2001); *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 896-97 (1st Cir. 1988). *See also Carmichael v. Galbraith*, 574 F. App'x 286, 293-94 (5th Cir. 2014) (Dennis, J., concurring in the judgment) (collecting cases).

court may consider evidence of post-complaint harassment that "arise[s] out of the scheme that was the focus of the pleadings, . . . [is] directly related to the earlier violation, and [will not result in] undue prejudice to the defendants." *Jund v. Town of Hempstead*, 941 F.2d 1271, 1287 (2d Cir. 1991). Defendants are not prejudiced when a complaint puts them on notice that plaintiffs are alleging a continuing action based on a hostile environment. *See Hubbard v. Port Auth. of N.Y. & N.J.*, No. 05 Civ. 4396, 2008 WL 464694, at *7 (S.D.N.Y. Feb. 20, 2008). Here, the Court finds that plaintiffs' complaint put defendants' on notice that plaintiffs were pleading the continuing existence of a racially hostile environment in RULH schools. (*See* Doc. 1 at ¶¶ 14, 15, 33, 42, 45, 49); Fed. R. Civ. P. 8(a)(2). Thus, evidence of post-complaint incidents of harassment is relevant to plaintiffs' claims, and the Court's consideration of it will not unduly prejudice defendants. *See Jund*, 941 F.2d at 1287; *Hubbard*, 2008 WL 464694. With these preliminary issues resolved, the Court now turns to consideration of whether summary judgment is appropriate on plaintiffs' Title VI claim.

### 1. Defendants Hasselbusch and Skinner are not proper defendants under Title VI

While RULH meets the definition of a "program or activity" under 42 U.S.C. § 2000d-4a(2)(B), the individual defendants do not meet that definition and are not subject to liability under Title VI. *See, e.g.*, *Shotz*, 344 F.3d at 1171; *Farm Labor Org. Comm.*, 95 F. Supp.2d at 741. Accordingly, summary judgment is granted for defendants Hasselbusch and Skinner on plaintiffs' Title VI claims against them. The Court will now consider whether summary judgment is appropriate only as to the Title VI claim against RULH.

20

2. **Whether the racial harassment that plaintiffs experienced was severe, pervasive, and objectively offensive**

The Court finds that plaintiffs have presented sufficient evidence from which a jury could reasonably conclude that they were subjected to harassment that was severe, pervasive, and objectively offensive.

        a. *Austin*

Plaintiffs present evidence that defendant Skinner frequently told Austin he "looked like a skunk with that hair." (Doc. 30 at 13). She also often asked, "Why are you bringing up the race card?" in circumstances where Austin had not said anything about race. (*Id.* at 16). In seventh grade, D.A. called Austin a "nigger." (*Id.* at 17-18). Austin attests that Ms. Puckett said "nigger" in class, and Mr. Stanfield referred to him as "8-ball" on many different occasions. (Doc. 54-1, Exh. A at ¶¶ 5-6). Austin also testified that he did not report additional incidents of racism to school authorities because "[n]othing happened" when he did report. (Doc. 30 at 21).

Viewing this evidence in the light most favorable to Austin as the Court must do on summary judgment, a reasonable jury could conclude from these incidents taken together that Austin experienced racial harassment that was severe, pervasive, and objectively offensive. Accepting Austin's testimony as true for the purposes of the instant motion, he suffered from more than one or two isolated incidents of racial harassment. Moreover, a jury could reasonably find that the majority of the harassment to which Austin testified was magnified because it came from teachers and administrators, not students. *See* Dep't of Educ., Racial Incidents & Harassment Against Students at Educ. Insts.; Investigative Guidance, 59 Fed. Reg. 11448, 11449 (Mar. 10, 1994) ("[R]acially based conduct by a teacher . . . may have a greater impact on a student than the same conduct by a school maintenance worker or another student.").[7]

---

[7] "The Department of Education is the agency charged by Congress with enforcing Title VI. As such, its

While defendants argue that plaintiffs have produced no evidence that Austin was deprived of educational opportunities or benefits (*see* Doc. 49-1 at 14-15), a reasonable jury could conclude that Austin was improperly denied educational benefits as a result of this harassment inasmuch as it "deprived [him] of a supportive, scholastic environment free of racism and harassment." *Zeno*, 702 F.3d at 667.  Moreover, Austin testified that as a result of disparate discipline, he received suspensions and was kicked off the basketball team.  Thus, the Court concludes that plaintiffs have provided sufficient evidence to raise a genuine issue of fact as to whether Austin was subjected to racial harassment that was severe, pervasive and objectively offensive.

      b.   <u>A.B./N.B.</u>

A.B. testified that the following students used the word "nigger" or a variant of that word in school or on the bus:  A.T., L.J., R.H., A.C., E.C., M.H., and R.P.  (Doc. 28 at 33; Doc. 29 at 59-60, 70-72, 74, 87-88, 104; Doc. 54-5, Exh. E at ¶ 3; Doc. 54-15, Exh. P).  A.B. also testified that she overheard defendant Hasselbusch say "nigger" while on a phone call.  (Doc. 28 at 47).  Additionally, R.H. said that he wanted to join the Ku Klux Klan; A.B. found the words "Zach is a nigger" written in a drawer of a computer desk; and T.H., A.S., and B.C. stated that they did not like black people.  (Doc. 28 at 12; Doc. 29 at 66-67, 76-78, 85; Doc. 48 at 39-40).

In addition to A.T.'s use of the word "nigger" in N.B.'s presence, plaintiffs have produced evidence that the following students also called N.B. a "nigger" or used that word in his presence:  K.L., A.M., and J.C.  (Doc. 31 at 29-30, 52-53, 57-58, 60; Doc. 41 (sealed) at 50-55; Doc. 49-1, Exhs. A & B).  Additionally, plaintiffs have produced evidence that T.B. and

---

interpretation is entitled to a high degree of deference by the courts so long as it does not conflict with a clearly expressed congressional intent and it is reasonable."  *Monteiro*, 158 F.3d at 1033 (citing *Chevron v. Nat. Res. Def. Council*, 467 U.S. 837, 844-45 (1984)).

K.B. wore homemade beaded bracelets that spelled the word "nigger" on them, and A.T. once said that "black people shouldn't belong in this world." (Doc. 31 at 35-38, 50).

A reasonable jury could conclude that both A.B. and N.B. experienced racial harassment that was severe, pervasive, and objectively offensive. Accepting their testimony as true for purposes of the instant motion, the racial harassment that A.B. and N.B. experienced was pervasive inasmuch as it involved racially offensive conduct on the part of at least fifteen of their classmates. The frequent use of the word "nigger" by many of their white classmates could establish harassment that was severe and pervasive. *Zeno*, 702 F.3d at 667; *Monteiro*, 158 F.3d at 1033-34.

While defendants argue that plaintiffs have produced no evidence that A.B. and N.B. were deprived of educational opportunities or benefits, (*see* Doc. 49-1 at 14-15), a reasonable jury could find that in an educational environment where use of the word "nigger" is ubiquitous, African-American students could be deprived of the educational benefit of learning in "a supportive, scholastic environment free of racism and harassment." *Zeno*, 702 F.3d at 667. Moreover, A.B. testified that she went home from school on November 5, 2014 because of the harassment she experienced that day. (Doc. 28 at 12; Doc. 54-5, Exh. E at ¶ 8). Additionally, N.B. testified that his family moved from the RULH school district because his dad wanted him to go to a different school, which a jury could reasonably conclude was motivated by the harassment N.B. had experienced. (Doc. 31 at 11, 15); *see Zeno*, 702 F.3d at 667 ("Where . . . the decision to withdraw was motivated by a racially hostile educational environment, a strong nexus between the harassment and the deprivation of educational benefits is evident."). Thus, the Court finds that plaintiffs have provided sufficient evidence to raise a genuine issue of fact for jury resolution on the first requirement for Title VI liability as to each plaintiff.

### 3. Whether defendant RULH had actual knowledge of the racial harassment

For purposes of the motion for summary judgment, defendant RULH concedes that it had actual knowledge of the incidents of harassment described in defendants' motion, "except with regard to events which have been expressly admitted as not being reported by the Plaintiffs." (Doc. 49-1 at 16). Thus, RULH has conceded actual knowledge of the following incidents: (1) defendant Skinner saying that Austin "looked like a skunk with that hair" and asking him "why do you always have to pull the race card?"; (2) L.J. saying "peace out nigga" to A.B. on October 4, 2011; (3) A.T. saying "nigger" on the bus on October 6, 2011; (4) R.H. stating that he wanted to join the Ku Klux Klan on December 19, 2013; (5) T.H.'s statements about black people on May 14, 2014; (6) M.H. saying "fuck you nigger" on May 25, 2014; (7) A.S. and B.C. saying that they did not like black people on November 5, 2014; (8) someone writing "Zach is a nigger" on a desk; (9) A.M. saying "nigger" in art class on January 24, 2012; (10) K.L. saying the "n-word" on March 22, 2011; (11) T.B. and K.B. wearing bracelets that said "nigger" on February 18, 2012; (12) J.C. calling N.B. a "nigger" on October 9, 2012; and (13) A.T. using the "n-word" on the bus in August 2011. (*Id.* at 2-9).

In addition, assessing the evidence in the light most favorable to the plaintiffs as the non-moving party, the Court finds that a jury could reasonably conclude that RULH also had actual knowledge of several other incidents. First, Austin testified that in the 2007-08 school year, he was disciplined for calling D.A. a "honky" after D.A. called him a "nigger," from which a jury could reasonably conclude that RULH had knowledge of the incident. (Doc. 30 at 17-18). Second, Austin attests that he was suspended and kicked off the basketball team for a disciplinary incident that occurred in 2008, when he was in the eighth grade. (Doc. 54-1, Exh. A at ¶ 3). Third, N.B. testified that in addition to the incident with A.M. in art class N.B. also

reported to defendant Hasselbusch an incident where A.M. called him a "nigger" in social studies. (Doc. 31 at 29-30, 32-33). Fourth, N.B. testified that he and A.T. were once sent to the office concerning an incident in which A.T. said "black people shouldn't belong in this world." (*Id.* at 50). For these four incidents, a reasonable jury could find that RULH principals were "appropriate persons" who had knowledge of these incidents, which would be sufficient to impute knowledge of them to RULH. *See Gebser*, 524 U.S. at 290; *Davis*, 233 F.3d at 1371; *Vance*, 231 F.3d at 258; *Doe*, 220 F.3d at 384.

However, the Court finds that plaintiffs have not provided any evidence from which a jury could reasonably find that RULH had actual knowledge of the remaining incidents. Specifically, Austin did not indicate that he had reported the incidents where Ms. Puckett said "nigger" in class or Mr. Stanfield referred to him as "8-ball." (Doc. 54-1, Exh. A). A.B. did not indicate that she reported overhearing defendant Hasselbusch say "nigger" two times while on the phone. (Doc. 28 at 47-50); *see Gebser*, 524 U.S. at 291 ("Where a school district's liability rests on actual notice principles . . . the knowledge of the wrongdoer [herself] is not pertinent to the analysis."). For RULH to face the possibility of monetary damages for Hasselbusch's comments, A.B. needed to have reported those comments to an "appropriate person," *i.e.*, someone with "authority to address the alleged discrimination and to institute corrective measures on the [school district's] behalf." *Gebser*, 524 U.S. at 290. The Court finds that because the alleged wrongdoer in this incident was the school principal herself, the "appropriate person" to whom A.B. needed to report the incident was the school superintendent or the school board because they would have been the only people with the authority to discipline Hasselbusch on RULH's behalf. A.B. also testified that she did not report the May 2014 incident where A.C. said "fucking niggers." (Doc. 29 at 73).

25

While A.B. testified that she reported to her bus driver the May 2014 incident where E.C. said "damn, nigga," the record does not contain any evidence that RULH knew about or responded to the incident. *See Gebser*, 524 U.S. at 290 ("[A] damages remedy will not lie . . . unless an official who at a minimum has authority to address the alleged [harassment] and to institute corrective measures on the [school district's] behalf has actual knowledge of [harassment] . . . and fails adequately to respond."); *Staehling v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:07-0797, 2008 WL 4279839, at *10 (M.D. Tenn. Sept. 12, 2008) ("A school bus driver is not an 'appropriate person' with authority for purposes of Title IX liability."); *Nelson v. Lancaster Indep. Sch. Dist. No. 356*, No. CIV 00-2079, 2002 WL 246755, at *5 (D. Minn. Feb. 15, 2002) (same). Further, A.B. testified that she did not report R.P. for sending her a picture that referred to another student as a "niggtard," and A.B. did not indicate— and the record does not reveal—that she reported the racial comments that a student made to her in art class on October 23, 2014. (Doc. 29 at 105; Doc. 54-5, Exh. E). Accordingly, the Court will not consider these incidents in its consideration of whether a reasonable jury could conclude that RULH was deliberately indifferent to the harassment that plaintiffs experienced.

### 4. Whether defendant RULH was deliberately indifferent

#### a. *Austin*

With the exception of the comments made by defendant Skinner, a reasonable jury could find that RULH was deliberately indifferent as to the harassment experienced by Austin. As to defendant Skinner's "skunk" and "race card" comments, plaintiffs have not provided any evidence that Austin reported these comments to any other official at RULH. Thus, RULH could not be deliberately indifferent to that harassment. *See Gebser*, 524 U.S. at 291 ("Where a school district's liability rests on actual notice principles . . . the knowledge of the wrongdoer

[herself] is not pertinent to the analysis.").  In the absence of any evidence showing Austin reported those comments to the superintendent or school board, *i.e.*, someone with "authority to address the alleged discrimination and to institute corrective measures on the [school district's] behalf," *id.* at 290, RULH cannot be held liable for such comments under Title VI.

This leaves D.A.'s calling Austin a "nigger" in seventh grade and Austin's being kicked off the basketball team in eighth grade as the only incidents upon which to base a finding of deliberate indifference as to Austin on the part of RULH.  As to D.A.'s calling Austin a "nigger," Austin testified that he received a suspension for his part in that incident, but D.A. was not disciplined.  (Doc. 30 at 17-18; Doc. 54-1, Exh. A at ¶ 4).  Defendants have offered no evidence to rebut Austin's testimony that RULH failed to discipline D.A.  Viewing this evidence in the light most favorable to Austin as the Court must do on summary judgment, a reasonable jury could find that RULH's failure to discipline D.A. showed deliberate indifference.  *See Zeno*, 702 F.3d at 666 ("A failure to respond . . . [has] been found inadequate.").

Additionally, Austin attests that for a separate incident in 2008 he was suspended and kicked off the basketball team.  (Doc. 54-1, Exh. A at ¶ 3).  Austin further avers that D.A. also received a suspension that year but was not kicked off the basketball team.  (*Id.*).  Again, defendants have offered no evidence to rebut Austin's testimony that RULH discriminated in the way it disciplined him as compared to the way it disciplined white students.  Accordingly, summary judgment is denied on Austin's Title VI claim against RULH.

b.  <u>A.B./N.B.</u>

Given the numerous incidents of racial harassment alleged by A.B. and N.B., which RULH does not dispute, a jury could reasonably find that RULH was aware that its response was inadequate, and that RULH nonetheless failed to take reasonable steps to address that

harassment.  While RULH argues that it disciplined the offending students in every reported incident, a reasonable jury could find that RULH's disciplinary measures were inadequate. Although in most cases discipline against an individual harasser was effective as to that harasser, RULH's disciplinary response was not effective in ending the hostile environment.  *See Patterson*, 551 F.3d at 448 ("We cannot say that, as a matter of law, a school district is shielded from liability if that school district knows that its methods of response to harassment, though effective against an individual harasser, are ineffective against persistent harassment against a single student.  Such a situation raises a genuine issue of material fact for a jury to decide."). The evidence shows that RULH knew that the following students had said "nigger" or a variant of that word between 2011 and 2014: L.J., R.H., M.H., A.M., K.L., J.C., and A.T.  Additionally, RULH was aware that:  (1) R.H. had stated that he wanted to join the Ku Klux Klan; (2) T.H., A.S., and B.C. had made comments about not liking black people; (3) someone had written "Zach is a nigger" on a desk; (4) T.B. and K.B. had worn bracelets that said "nigger"; and (5) A.T. had said "black people shouldn't belong in this world."

Given this evidence of continuing and widespread racial harassment over a four-year period—despite RULH's disciplinary actions against the individual harassers—a reasonable jury could conclude that RULH eventually "had knowledge that its response was inadequate, [but failed] to take further reasonable action in light of the circumstances to avoid new liability." *Vance*, 231 F.3d at 262.  The number of incidents of harassment, together with the proven ineffectiveness of RULH's disciplinary measures in changing the culture of harassment, raise a genuine issue of material fact for a jury to decide whether a greater response was required on the part of RULH to address the racial harassment.  *See, e.g., Patterson*, 551 F.3d at 448 (holding that a situation where a "school district knows that its methods of response to harassment, though

effective against an individual harasser, are ineffective against persistent harassment" raises a genuine issue of material fact for the jury); *Zeno*, 702 F.3d at 669-71 (holding that jury reasonably found that school district was deliberately indifferent when it did not timely implement any non-disciplinary remedial action once it knew that its disciplinary measures against individual harassers did not deter others from engaging in serious and offensive racial harassment); *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp.3d 332, 363 (S.D.N.Y. 2014) (finding that a reasonable jury could conclude that a school district was deliberately indifferent where it did not take further remedial action once it had knowledge that its "attempts at disciplining students for harassment did not appear to have had an effect on the slurs" against Jewish students).  In short, given the evidence before the Court, a reasonable jury could find that RULH was deliberately indifferent to the racial harassment that A.B. and N.B. experienced. Accordingly, summary judgment is denied on A.B. and N.B.'s Title VI claims against RULH.

C.  <u>SECTION 1983</u>

A claimant is entitled to redress under § 1983 if she can prove that a person acting under color of state law committed an act that deprived her of some right, privilege, or immunity protected by the Constitution or laws of the United States.  42 U.S.C. § 1983.  "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  To demonstrate a violation of the Fourteenth Amendment's Equal Protection Clause, plaintiffs must demonstrate defendants' racially discriminatory intent with respect to their response to student-on-student harassment.  *Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612, 618 (6th Cir. 2012) (citing *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 139-40 (2d Cir. 1999)).  To act with discriminatory intent, "[d]efendants must have been deliberately indifferent to the allegations of student-on-student racial harassment."  *Id.*

29

"Deliberate indifference to discrimination can be shown from a defendant's actions or inaction in light of known circumstances." *Id.* (citing *Gant*, 195 F.3d at 141).

Official-capacity suits "'represent only another way of pleading an action against an entity of which an officer is an agent.' As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690 n.55 (1978)). Thus, when a § 1983 complaint asserts a claim against a government entity and a government official in her official capacity, federal courts will dismiss the official-capacity claim. *Doe v. Claiborne Cty., Tenn. by & Through Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 509 (6th Cir. 1996) (affirming district court's dismissal of official-capacity suits).

To succeed on a § 1983 claim against RULH, plaintiffs must demonstrate both: "(1) the deprivation of a constitutional right, and (2) the School District is responsible for that violation." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell*, 436 U.S. at 694.

### 1. Whether plaintiffs may bring suit against defendants Hasselbusch and Skinner in their official capacities

Because the official-capacity claims under § 1983 against Hasselbusch and Skinner are duplicative of the § 1983 claim against RULH, summary judgment is granted on plaintiffs' official-capacity claims against Hasselbusch and Skinner. *See Graham*, 473 U.S. at 165; *Doe*, 103 F.3d at 509.

30

**2. Whether summary judgment is appropriate on plaintiffs' § 1983 claims against RULH**

The Court finds that summary judgment is not appropriate on plaintiffs' § 1983 claims against RULH. As the Court already explained in its discussion of Title VI, a reasonable jury could find that RULH was deliberately indifferent to the racial harassment that plaintiffs experienced. In the context of § 1983, a reasonable jury could conclude that RULH's custom of responding inadequately to racial harassment caused that harassment to continue, such that RULH became a responsible entity under § 1983. *See Monell*, 436 U.S. at 694. Accordingly, summary judgment is denied on plaintiffs' § 1983 claim against RULH.

**3. Whether summary judgment is appropriate on plaintiffs' § 1983 claims against Hasselbusch and Skinner in their individual capacities**

As to defendant Hasselbusch, accepting the evidence in the light most favorable to plaintiffs, the record shows that she had actual notice of the following incidents of racial harassment: (1) A.T. saying the "N-word " on the bus on August 29, 2011; (2) L.J. saying "peace out nigga" on October 4, 2011; (3) A.T. saying "nigger" on the bus in October 2011; (4) A.M. calling N.B. a "nigger" in social studies class; (5) A.M. saying "nigger" in art class; and (6) T.B. and K.B. wearing bracelets that spelled the word "nigger" in February 2012. (Doc. 28 at 33; Doc. 29 at 59-60; Doc. 31 at 29-33, 35-38, 52-53; Doc. 49-1, Exhs. A, C, and G; Doc. 54-9, Exh. I). Additionally, A.B. testified that while she was waiting outside Hasselbusch's office to see her concerning a disciplinary incident, she overheard Hasselbusch say "nigger" two times while on a phone call. (Doc. 28 at 47).

Taking these incidents together, and for the reasons already explained in the Court's discussion of Title VI, a reasonable jury could find that Hasselbusch was deliberately indifferent to racial harassment against A.B. and N.B., in violation of the Equal Protection Clause of the

31

Fourteenth Amendment.  *See Williams*, 455 F. App'x at 618.  In addition to at least six separate incidents of student-on-student harassment, plaintiffs have presented evidence that Hasselbusch herself used the word "nigger" within hearing of A.B.  While Hasselbusch was a principal at RULH for only one year, a reasonable jury could still find that her responses to these incidents, and alleged use of racial epithets herself, constituted deliberate indifference to the culture of racism in RULH schools.

As to defendant Skinner, accepting the evidence in the light most favorable to plaintiffs, the record shows that she had actual notice of the following incidents of racial harassment: (1) R.H. saying he wanted to join the Ku Klux Klan because students listening to rap music were acting like "niggers"; (2) the words "Zach is a nigger" being written in a desk; (3) T.H. saying she did not like black people; (4) M.H. saying "Fuck you, Nigger"; (5) A.S. and B.C. saying they did not like black people; and (6) J.C. calling N.B. a "nigger."  (Doc. 28 at 12; Doc. 29 at 85, 87-89; Doc. 41 (sealed) at 11-14, 25-28, 50-55; Doc. 45 at 28-29; Doc. 48 at 39-40, 50-53; Doc. 54-15, Exh. P).  Additionally, Skinner frequently told Austin that he "looked like a skunk with that hair" and often asked him, "Why are you bringing up the race card?"  (Doc. 30 at 13-16; Doc. 48 at 65).

Taking these incidents of student-on-student harassment together, and for the reasons already explained in the Court's discussion of Title VI, a reasonable jury could find that Skinner was deliberately indifferent to racial harassment against A.B. and N.B., in violation of the Equal Protection Clause of the Fourteenth Amendment.  *See Williams*, 455 F. App'x at 618.  Further, a jury could reasonable conclude that Skinner's personal use of racial comments to Austin demonstrated a discriminatory intent.  "Race card" comments, by their very nature, could lead a reasonable jury to infer that Skinner was treating Austin differently than white students as it was

unlikely that Skinner would accuse white students of "playing the race card."  *See Fennell v. Marion Indep. Sch. Dist.*, 963 F. Supp.2d 623, 635-36 (W.D. Tex. 2013) (holding that defendant school official's criticism of African-American student's "ethnic" hairstyle could constitute an Equal Protection violation when the official never criticized the hairstyles of students of other races).  Thus, plaintiffs have produced evidence that Austin received unequal treatment that he would not have received if he were not an African American.

Accordingly, summary judgment is denied on plaintiffs' § 1983 claims against Hasselbusch and Skinner in their individual capacities.

D. <u>QUALIFIED IMMUNITY</u>

"[G]overnment officials performing discretionary functions [are entitled to] a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  The Supreme Court has described a two-part analysis for resolving government officials' qualified immunity claims.  First, a court must ask whether the defendant's conduct violated a constitutional right.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  Second, the court must determine whether the constitutional right was "clearly established" at the time of the defendant's conduct.  *Id.*  A court may begin its analysis with either prong, but both questions must be answered in the affirmative for liability to attach.  *Id.* at 236.

As explained above, a reasonable jury could find that the conduct of Skinner and Hasselbusch violated plaintiffs' right to equal protection under the law.  Thus, the Court must determine whether that constitutional right was "clearly established" at the time of their conduct. *Pearson*, 555 U.S. at 232.  In *Vance*, the Sixth Circuit held that when school officials "have

knowledge that [their] remedial action is inadequate and ineffective, [they are] required to take reasonable action in light of those circumstances to eliminate the behavior." *Vance*, 231 F.3d at 261.  The Sixth Circuit decided *Vance* in 2000, more than ten years before most of the incidents relevant to this lawsuit.  Thus, the law was "clearly established" at the time of defendants' actions that "inadequate and ineffective" responses to student-on-student harassment could open them to liability if they did not take additional "reasonable action."  *See id.*  Accordingly, Hasselbusch and Skinner are not entitled to qualified immunity on plaintiffs' equal protection claims.

Further, as to Skinner's comments to Austin, it was clearly established at the time of those comments that the Equal Protection Clause of the Fourteenth Amendment prohibits racial discrimination.  *See, e.g., Washington v. Davis*, 426 U.S. 229, 239 (1976) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race.").  Thus, a reasonable person would know that making racially discriminatory comments in the school setting would not be consistent with a student's rights under the Equal Protection Clause.  *See Anderson*, 483 U.S. at 638.  Thus, Skinner is not entitled to qualified immunity.

**V. Conclusion**

Consistent with the foregoing, it is **ORDERED** that defendants' motion for summary judgment (Doc. 49) is:

1. **GRANTED** for defendants Hasselbusch and Skinner on plaintiffs' Title VI claims against them;

2. **DENIED** on plaintiffs' Title VI claims against RULH;

3. **GRANTED** on plaintiffs' official capacity claims under § 1983 against defendants

   Hasselbusch and Skinner;

4. **DENIED** on plaintiffs' § 1983 claims against RULH and against defendants

   Hasselbusch and Skinner in their individual capacities; and

5. **DENIED** on defendants Hasselbusch and Skinner's claims of qualified immunity.

**IT IS SO ORDERED.**


Date:  10/15/15                              s/Karen L. Litkovitz
                                    Karen L. Litkovitz
                                    United States Magistrate Judge